UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| LANDON B., <br><br> Plaintiff, <br><br> v. <br><br> KILOLO KIJAKAZI, Acting Commissioner of the Social Security Administration, <br><br> Defendant. | **MEMORANDUM DECISION AND ORDER REVERSING AND REMANDING COMMISSIONER'S DECISION** <br><br> Case No. 2:21-cv-00217 <br><br> Magistrate Judge Daphne A. Oberg |

    Plaintiff Landon B.[1] brought this action against Kilolo Kijakazi, Acting Commissioner of the Social Security Administration (the "Commissioner"), seeking judicial review of the denial of his application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401–34. (*See* Compl., Doc. No. 3.) The Administrative Law Judge ("ALJ") determined Mr. B. did not qualify as disabled. (Certified Tr. of Admin. R. ("Tr.") 15–25, Doc. No. 15.) The court[2] has carefully reviewed the entire record and the parties' briefs.[3] Because the ALJ failed to properly consider the medical opinion of Mr. B.'s treating provider, Mr. Lovelace, the court reverses the Commissioner's decision and remands the case for further administrative proceedings.

---

[1] Pursuant to best practices in the District of Utah addressing privacy concerns in certain cases, including Social Security cases, the court refers to Plaintiff by his first name and last initial only.

[2] The parties consented to proceed before a magistrate judge in accordance with 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (Doc. No. 10.)

[3] This order is based on the written memoranda, as oral argument is unnecessary. *See* DUCivR 7-1(g).

1

## STANDARD OF REVIEW

Section 405(g) of Title 42 of the United States Code provides for judicial review of a final decision of the Commissioner. This court reviews the ALJ's decision to determine whether substantial evidence supports the factual findings and whether the ALJ applied the correct legal standards. 42 U.S.C. § 405(g); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "[F]ailure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principals have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005).

An ALJ's factual findings are "conclusive if supported by substantial evidence." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153, ___ U.S. ___ (2019) (internal quotation marks omitted). Although the evidentiary sufficiency threshold for substantial evidence is "not high," it is "more than a mere scintilla." *Id.* at 1154 (internal quotation marks omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Lax*, 489 F.3d at 1084 (internal quotation marks omitted). And the court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004).

## APPLICABLE LAW

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is considered

disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

In making a disability determination, the ALJ employs a five-step sequential evaluation, considering whether:

1) the claimant is engaged in substantial gainful activity;

2) the claimant has a severe medically determinable physical or mental impairment or combination of impairments;

3) the impairment or combination of impairments is equivalent to an impairment which precludes substantial gainful activity, listed in the appendix of the relevant disability regulation;

4) the claimant has a residual functional capacity to perform past, relevant work; and

5) the claimant has a residual functional capacity to perform other work in the national economy considering his/her/their age, education, and work experience.

*See* 20 C.F.R. § 404.1520(a)(4); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Williams v. Bowen*, 844 F.2d 748, 750–51 (10th Cir. 1988). The claimant has the burden of establishing disability in the first four steps. *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989). At step five, the burden shifts to the Commissioner to show the claimant retains the ability to perform other work existing in the national economy. *Id.*

PROCEDURAL HISTORY

Mr. B. applied for Title II disability benefits on July 3, 2018, alleging disability beginning on February 16, 2016. (Tr. 15, 181–82.) The ALJ found Mr. B. last met the insured

status requirements of the Social Security Act on September 30, 2018. (*Id.* at 17.) After a hearing, the ALJ issued a decision on June 3, 2020, finding Mr. B. was not disabled during the period from his alleged onset date to his last insured date. (*Id.* at 15–25.)

At step two of the sequential evaluation, the ALJ found Mr. B. had the severe impairments of generalized anxiety disorder, obsessive-compulsive disorder, bipolar disorder, and schizoid personality disorder. (*Id.* at 18.) The ALJ found Mr. B.'s back pain was a nonsevere impairment. (*Id.*) At step three, the ALJ found Mr. B.'s impairments did not meet or equal the severity of an impairment listing. (*Id.* at 18–19.) The ALJ ultimately determined Mr. B. had the residual functional capacity to perform a full range of work at all exertional levels, but with the following nonexertional limitations:

> [T]he claimant is able to work in proximity to others, tolerating occasional interaction with supervisors and coworkers, and brief, incidental interaction with the general public. The work involves no tandem job tasks, requiring cooperation with other workers to complete the task. He can understand, remember, and carry out simple, routine tasks that can be learned and mastered in up to 30 days. At such levels, [he] can maintain concentration, persistence or pace, make simple work-related decisions, plan and set goals, adapt to routine workplace changes, travel, and recognize and avoid ordinary workplace hazards.

(*Id.* at 19–20.) Based on this residual functional capacity assessment, the ALJ found Mr. B. unable to perform any past relevant work. (*Id.* at 23.) But the ALJ determined Mr. B. was not disabled because, at step five, she found Mr. B. capable of performing other jobs existing in significant numbers in the national economy. (*Id.* at 24–25.) The Appeals Council denied Mr. B.'s request for review, (*id.* at 1), making the ALJ's decision final for purposes of judicial review.

DISCUSSION

Mr. B. raises a single claim of error: he argues the ALJ's residual functional capacity determination is unsupported by substantial evidence because the ALJ failed to properly evaluate the medical opinion of his treating provider, Matthew Lovelace. (Opening Br. 1, Doc. No. 18.)

The Social Security Administration implemented new regulations for evaluating medical evidence for claims, like Mr. B.'s, filed after March 27, 2017. *See Revisions to Rules Regarding the Evaluation of Med. Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132 (Mar. 27, 2017)); 20 C.F.R. § 404.1520c. Under the new regulations, the ALJ does not "defer or give any specific evidentiary weight, including controlling weight," to any medical opinions. 20 C.F.R. § 404.1520c(a). Instead, the ALJ assesses the persuasiveness of medical opinions by evaluating the following factors: (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) other factors. *Id.* § 404.1520c(b), (c). Supportability and consistency are the most important factors the ALJ must consider—and the ALJ is required to explain how she considered these two factors. *See id.* § 404.1520c(b)(2). For supportability, the ALJ examines how well medical sources support their own opinions with "objective medical evidence" and "supporting explanations." *Id.* § 404.1520c(c)(1). For consistency, the ALJ considers whether the medical opinion is consistent with evidence from other medical and nonmedical sources in the record. *Id.* § 404.1520c(c)(2).

While an ALJ need not discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence." *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996). "[I]n addition to discussing the evidence supporting [her] decision, the ALJ also must discuss the uncontroverted evidence [she] chooses not to rely upon, as well as significantly probative evidence [she] rejects." *Id.* at 1010.

Mr. Lovelace, a physician's assistant, was Mr. B.'s primary care provider during the relevant time period. In July 2018, Mr. Lovelace completed a mental capacity assessment on a check-box form. (*Id.* at 382–84.) Mr. Lovelace opined Mr. B. had "extreme" limitations in his ability to: initiate and perform tasks he knew how to do, work at an appropriate and consistent pace or complete tasks in a timely manner, avoid distractions, sustain a routine and regular attendance, adapt to changes, manage psychologically based symptoms, make plans independently, and cooperate with others or ask for help. (*Id.*) Mr. Lovelace opined Mr. B. had "marked" limitations in his ability to perform multi-step activities, set realistic goals, and handle conflicts. (*Id.*) In the narrative section of the form, Mr. Lovelace wrote that Mr. B. "ha[d] been diagnosed by mental health professionals with obsessive-compulsive disorder that is extremely limiting and debilitating most days." (*Id.* at 383.) Mr. Lovelace also noted Mr. B. "ha[d] moderate to severe anxiety that can impact how well he interacts with others." (*Id.* at 384.)

The ALJ found Mr. Lovelace's opinion was "not persuasive" for the following reasons:

> [H]e is not mental health specialist. His own notes reflect normal findings on psychiatric examinations and there is no support in conjunction with this check-box form. He appears to have relied heavily on [Mr. B.'s] subjective reports. There is no evidence in the record of periods of decompensation or hospitalizations. The claimant has been able to attend his appointments, with no annotations that [Mr. B. was] chronically late or not showing up. He is also able to drive and his mental status examinations have been substantially normal.

(*Id.* at 21.)

Mr. B. challenges each reason provided by the ALJ for discounting Mr. Lovelace's opinion. As set forth below, the ALJ failed to properly assess both the supportability and the consistency factors, (*see* 20 C.F.R. § 404.1520c(c)(1)–(2)), by neglecting to discuss significantly probative evidence in the record supportive of and consistent with Mr. Lovelace's opinion. And many of the ALJ's stated reasons for discounting Mr. Lovelace's opinion are unsupported by the

6

record or lack sufficient explanation. In light of these deficiencies, the ALJ failed to properly consider Mr. Lovelace's opinion.

First, the ALJ's statement that Mr. Lovelace offered "no support in conjunction with [the] check-box form," (Tr. 21), ignores the supporting explanations on the form itself. Mr. Lovelace explained his assessment was based on (1) mental health professionals' diagnosis of Mr. B. with obsessive-compulsive disorder ("OCD") which was "extremely limiting and debilitating most days," and (2) Mr. B.'s moderate to severe anxiety which "[could] impact how well he interacts with others." (*Id.* at 383–84.) Thus, Mr. Lovelace relied, at least in part, on the diagnoses and findings of Mr. B.'s mental health providers in forming his opinion. The ALJ failed to recognize this, instead speculating that Mr. Lovelace relied primarily on Mr. B.'s subjective reports. (*Id.* at 21.) Maybe because of this, the ALJ did not discuss whether the underlying evidence from Mr. B.'s mental health providers was supportive of or consistent with the assessed limitations.

Mr. B. identifies numerous records from his mental health providers which are potentially supportive of and consistent with Mr. Lovelace's opinion. In 2012, Dr. Janiece Pompa, a licensed psychologist, conducted a psychological evaluation of Mr. B. and diagnosed him with generalized anxiety disorder, OCD, and schizoid personality disorder. (*Id.* at 280–87.) From 2014 to 2017, Mr. B. received treatment from a psychiatrist, Dr. Donald Harline, who prescribed medications for anxiety. (*Id.* at 309–47.) Throughout this period, Dr. Harline observed Mr. B. was anxious, had a flat affect, and avoided eye contact. (*Id.* at 310, 313, 316, 319, 322, 325, 328, 331, 334–35, 338, 341, 344, 347.) Dr. Harline noted Mr. B.'s symptoms included apprehension, shortness of breath, and tachycardia; the frequency of symptoms was "nearly constant"; and Mr. B. experienced "true panic attacks" in addition to generalized anxiety. (*Id.* at 309.) Dr. Harline also noted Mr. B.'s triggers included "crowds or public places or being around people in

general." (*Id.*) In November 2015, Mr. B. told Dr. Harline his stress levels decreased his ability to focus and caused him to "recheck to be sure he has the things he needs for the day multiple times in the morning," which "caused problems with being on time for work." (*Id.* at 330.) Mr. B. also saw a therapist, Mr. Timothy Ponce, for several months in 2017. (*Id.* at 349–80.) Mr. B. reported his anxiety, depression, and OCD caused severe panic attacks at work, and he was asked to take a leave of absence to stabilize his mental health. (*Id.* at 349–51.) Mr. Ponce noted Mr. B.'s anxiety, OCD, and depression caused "serious vocational problems." (*Id.* at 351.) Mr. Ponce diagnosed Mr. B. with generalized anxiety disorder, OCD, agoraphobia with panic disorder, and major depressive disorder. (*Id.* at 356.) Mr. Ponce consistently observed Mr. B. was severely anxious during visits and his insight and judgment were impaired. (*Id.* at 350, 362, 375, 379.) Finally, Mr. B. received treatment at a neurology clinic with Dr. Marty Rueckert in 2018. (*Id.* at 440–44.) Dr. Rueckert noted Mr. B. was consistently late to appointments and reported missing entire family functions due to debilitating anxiety, and he was "unable to complete simple tasks daily such as moving firewood, raking leaves, or preparing to go places." (*Id.* at 440.)

      The ALJ mentioned some of these providers elsewhere in her decision, primarily in discussing Mr. B.'s medication history. (*See id.* at 22–23.) But the ALJ did not address whether these providers' treatment records were supportive of or consistent with Mr. Lovelace's opinion—maybe because she erroneously concluded Mr. Lovelace primarily relied on Mr. B.'s subjective statements instead of treatment records in forming his opinion. Where Mr. Lovelace referred to Mr. B.'s mental health providers' diagnoses and findings to explain his opinion, and their treatment records contain information relevant to the assessed functional limitations, these

providers' records are significantly probative. The ALJ erred by failing to discuss these records in evaluating Mr. Lovelace's opinion.

Several other reasons the ALJ provided for discounting Mr. Lovelace's opinion are also contrary to the record. The ALJ's statement that the record contains "no annotations that [Mr. B. was] chronically late or not showing up" to appointments is inaccurate. (*See* Tr. 21.) To the contrary, numerous records document Mr. B.'s consistent lateness and struggles with showing up to appointments. For example, Mr. B.'s therapist, Mr. Ponce, noted Mr. B. was forty-five minutes late to his first session on August 25, 2017. (*Id.* at 349.) On October 18 and December 18, 2017, Mr. Ponce observed Mr. B. continued to struggle with making appointments and showed significant anxiety. (*Id.* at 366, 379.) On November 13, 2018, Dr. Rueckert noted Mr. B. was consistently late to appointments and inconsistent about going to the clinic to receive treatment. (*Id.* at 440.) The ALJ also stated Mr. B. had no periods of decompensation, (*id.* at 21), but Mr. B.'s counseling records indicate he experienced a "psychiatric break" during the relevant time period, (*id.* at 350). The ALJ acknowledged this elsewhere in her decision but did not address it in her discussion of Mr. Lovelace's opinion. (*See id.* at 20–21.) Because these stated rationales mischaracterize the record evidence, they are not valid bases for discounting Mr. Lovelace's opinion.

The ALJ also stated Mr. Lovelace's "own notes reflect normal findings on psychiatric examinations." (*Id.* at 21.) But the ALJ did not include any citation to the record in support of this statement, and it is unclear what "psychiatric examinations" the ALJ was referring to. Mr. Lovelace's treatment records contain no psychiatric examinations beyond routine assessments of Mr. B.'s mental status at each visit—which the ALJ discussed separately at the end of the

9

paragraph addressing Mr. Lovelace's opinion. (*See id.*) There is no evidence of any other "psychiatric examinations" conducted by Mr. Lovelace which would undermine his opinion.

The ALJ noted Mr. B.'s mental status examinations were "substantially normal." (*Id.*) Although the ALJ did include any citation to the record, this statement appears to refer to the mental status notes found in many of Mr. Lovelace's treatment records, which indicate, under the heading "Physical Exam," that Mr. B. has "normal mood, normal language, normal thought, normal judgment, [and] normal attention." (*E.g., id.* at 392, 397, 400, 406, 409, 415, 418, 421, 430, 432, 434.) But these same records also contain mental status notes indicating Mr. B. was "anxious" (sometimes immediately after the note indicating "normal" mood, language, thought, judgment, and attention). (*Id.* at 424, 430, 432.) Mr. Lovelace's treatment records also discuss Mr. B.'s anxiety and OCD diagnoses and symptoms—and document the medications prescribed for these conditions. (*Id.* at 390–434.) Thus, these "normal" status notes do not appear to reflect the absence of mental health symptoms. Although they provide some support for the ALJ's evaluation, they are insufficient—on their own—to constitute substantial evidence for discounting Mr. Lovelace's opinion.

Several other reasons offered by the ALJ for discounting Mr. Lovelace's opinion likewise lack sufficient explanation. The ALJ noted there was no evidence of hospitalizations, but she failed to explain why this fact undermined Mr. Lovelace's opinion. It is unclear why Mr. B.'s assessed limitations would require hospitalization. The ALJ also noted Mr. B. was able to drive but, again, did not explain how this was inconsistent with Mr. B.'s assessed limitations or otherwise relevant to Mr. Lovelace's opinion. Without further explanation, these rationales do not provide valid bases for rejecting Mr. Lovelace's opinion.

Finally, the ALJ discounted Mr. Lovelace's opinion on the grounds that Mr. Lovelace was not a mental health professional. A medical source's specialization, or lack thereof, is a factor which may be considered in evaluating a medical opinion. *See* 20 C.F.R. § 404.1520c(c)(4) (noting the opinion of a specialist "may be more persuasive about medical issues related to his or her area of specialty" than the opinion of a non-specialist). Thus, the ALJ properly considered the fact that Mr. Lovelace was a primary care provider rather than a mental health specialist. But this factor, alone, is insufficient to discount Mr. Lovelace's opinion—particularly where he expressly relied on mental health providers' diagnoses and findings, and the ALJ failed to evaluate whether those providers' records supported Mr. Lovelace's conclusions.

For these reasons, the ALJ's evaluation of Mr. Lovelace's opinion is unsupported by substantial evidence and lacks sufficient explanation. The ALJ's failure to properly evaluate Mr. Lovelace's opinion is not harmless. When an ALJ erroneously discounts or rejects a medical opinion, the error can only be considered harmless "if there is no inconsistency between the opinion and the ALJ's assessment of residual functional capacity." *Mays v. Colvin*, 739 F.3d 569, 578–79 (10th Cir. 2014). Mr. Lovelace was the only provider who offered a medical opinion regarding Mr. B.'s functional limitations.[4] The "extreme" and "marked" limitations assessed by Mr. Lovelace, if credited by the ALJ, could substantially affect the ALJ's determination of Mr. B.'s residual functional capacity. Indeed, the Commissioner does not argue a failure to properly consider Mr. Lovelace's opinion would constitute harmless error.

---

[4] Two state agency psychologists opined Mr. B.'s mental impairments were not severe, but the ALJ found these opinions were not persuasive. (Tr. 21.)

Accordingly, the Commissioner's decision is reversed and the case is remanded for further consideration of Mr. Lovelace's opinion.

## CONCLUSION

The Commissioner's decision is REVERSED and the case is REMANDED for further administrative proceedings consistent with this order.

DATED this 21st day of September, 2022.

BY THE COURT:

_____
Daphne A. Oberg
United States Magistrate Judge